No. 20-1692

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

**Kylie DiDonato,**

*Plaintiff – Appellant,*

**v.**

**Tim Panatera
and City of Chicago,**

*Defendant – Appellee.*

**Appeal from the United States District Court
for the District of Illinois, Eastern Division
No. 19-CV-02737
The Honorable Judge Virginia M. Kendall**

**BRIEF OF PLAINTIFF - APPELLANT**

Nicholas F. Esposito
Bradley K. Staubus
ESPOSITO & STAUBUS LLP
7055 Veterans Blvd., Unit B
Burr Ridge, Illinois 60527
Telephone: (312) 346-2766
Facsimile : (312) 346-3177
Attorneys for Kylie DiDonato

## INDIVIDUAL DISCLOSURE STATEMENT

The party filing this appeal is Kylie DiDonato, an individual.

The names of the law firm whose partners or associates have appeared for Kylie DiDonato in this case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this Court is Esposito & Staubus LLP.

# TABLE OF CONTENTS

Individual Disclosure Statement……………………………………..…………...i

Table of Authorities…………………………....…..…………………….………...iv

Jurisdictional Statement……………………………………………..…………...1

Statement of Issues Presented for Review…………………………...…………….2

Statement of the Case………………………………………………………………3

   Nature of the Case…………………………………………………………………3

   Facts………………………………………………….…………………………5

Summary of Argument……………………………………………………………9

Standard of Review………………………………………………………………..11

Argument…………………………………………………………………………12

  I.   Fact Allegations Ignored by the District Court
     which with the Allegation Noted by the Court
     Demonstrates that Panatera acted under Color
     of State Law………………………………………………………………..12

  II.  DiDonato Pleads Sufficient Facts to Qualify
     for the *DeShaney* Exceptions………………………………………………14

  III. DiDonato Pleads That Panatera Had Custody
     Over Her, Requiring His Protection Because
     No Alternate Avenues of Aid Existed………………………………………15

  IV. DiDonato Has Pleaded That Panatera Placed
     Her in A Position of Danger Which She Would
     Not Otherwise Have Faced…………………………………………..…19

  V.  DiDonato Pleaded That Panatera Imposed upon
     Her a Restraint of Personal Liberty Triggering
     the Protections of the Due Process Clause………………………………....22

  VI. DiDonato Pleaded She Was Not Free to
     Leave and Seek Help on Her Own…………………………………………22

VII. DiDonato's Head Injury, while Incapacitating
Her, is not the Heart of Her Section 1983 Claims;
Rather it is Panatera's Subsequent Action and
Inaction that Followed, Increasing and
Exacerbating the Deprivation of Her Freedom,
Denied Her Medial Help, and Caused Her Further Damage……………...23

Conclusion  …………………………………….……………………25

Certificate of Compliance with Rule 32(a)…………………………………...26

Statement That All Required Materials Are in Appendix…………………….....26

Certificate of Service…………………………………………………………...27

Appendix………………………………………………………………………….28

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)…………………………………………11

*Bell Atlantic Corp. v. Twombly,* 7 L.Ed.2d 929 --- U.S. ----, 127 S.Ct. 1955, 1964, 16 929 --- U.S. ----, 127 S.Ct. 1955, 1964, 16 (2007)……………...……...……….24

*Buchanan–Moore v. Cnty. of Milwaukee,*
570 F.3d 824, 827 (7th Cir.2009)……………………………………...………16, 17

*DeShaney v. Winnebago Cty. Dep't of Soc. Servs.,*
489 U.S. 189, 197 (1989)……………………….....….2, 9, 10, 14, 15, 19, 21, 22, 30

*Doe v. Vill. of Arlington Heights,*
782 F.3d 911, 916 (7th Cir. 2015) …………………………………....14, 15, 23

*E.E.O.C. v. Concentra Health Servs.,*
496 F.3d 773, 776 (7th Cir. 2007) ……………………………...………..24

*Harrell v. Cook,*
169 F.3d 428 (7th Cir. 1999)……………………………...……………….....11, 24

*Hernandez v. City of Goshen, Ind.,* (7th Cir.2003)
324 F.3d 535, 538 (7th Cir. 2003)..……………………………………………...19

*Jackson v. Schultz,*
429 F.3d 586, 590 (6th Cir. 2005) …..………………………………...…23, 24

*Manistee Apartments, LLC v. City of Chi.,*
844 F.3d 630, 633 (7th Cir. 2016) ……………………….……………….12

*Martínez v. Hooper,*
*148 F. 3d 856 (7th Cir. 1998)*…………………………...……………………….11

*Monfils v. Taylor,*
165 F.3d 511 (7th Cir. 1998)…………………………………………………… 20

*Paine v. Cason,*
678 F.3d 500, 510 (7th Cir. 2012) …………………………….……………….…..20

*Reed v. Gardner,*
*986 F.2d 1122, 1127 (7th Cir. 1993)*...…………………………………..16, 17, 18, 20

*Rodriguez v. Plymouth Ambulance Servs.,*
577 F.3d 816, 822 (7th Cir. 2009)…………………..……………….. ...……14

*Salazar v. City of Chicago,*
1985 WL 2482, No. 84 C 10156  (N.D.Ill. Sep. 09, 1985)…….………21, 22, 25

*Sandage v. Bd. of Comm'rs,* (7th Cir.2008))
548 F.3d 595, 598–99 (7th Cir. 2008)……………………………………….…....19

*Slade v. Bd. of Sch. Dirs. of Milwaukee,* (7th Cir.2012)
702 F.3d 1027, 1030 (7th Cir. 2012)……………………………………………16

*W. BendMut. Ins. Co. v. Schumacher*,
844 F.3d 670, 675 (7th Cir. 2016) …………..……………….……….10, 12

*White v. Rochford,*
*592 F.2d 381, 382 (7th Cir. 1979)* ………………………….……….…..19

## Statutes

28 U.S.C. § 1441(a); 1446…………………………………………………1

42 U.S.C. § 1983 ………………………………………....3, 9, 10, 11, 23, 25

# JURISDICTIONAL STATEMENT

On December 7, 2018, Kylie DiDonato filed suit against Tim Panatera in the Circuit Court of Cook County for careless and negligent acts and/or omissions. On March 18, 2019,  DiDonato filed an amended complaint in the Circuit Court of Cook County against Panatera for negligence (Count I), assault (Count II), and battery (Count III), to add the City of Chicago as a defendant, and against Panatera and the City of Chicago for deliberate indifference under 42 U.S.C. § 1983 (Count IV) and willful and wanton misconduct (Count V). On April 23, 2019, the City of Chicago removed the case to the Northern District of Illinois pursuant to 28 U.S.C. § 1441(a); 1446, attached to which is the Summons and Amended Complaint. (Dkt. 1). The district court granted DiDonato leave to file a Second Amended Complaint (Dkt. 36, 37). The district court granted Panatera and the City of Chicago's motion to dismiss the § 1983 claim in Count IV and dismissed the City of Chicago as to the wilful and wanton claim in Count V. (Dkt. 57, p. 12). The district court dismissed without prejudice the non-federal claims in Counts I through III and Count V, declining to exercise any further supplemental jurisdiction over them. (Dkt. 57, p. 12).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

I.      In ruling upon this Motion to Dismiss where all well-pleaded facts are deemed true, whether the Court erred in finding that Plaintiff-Appellant DiDonato's Count IV Section 1983 claims against Panatera and the City of Chicago failed to show that Panatera acted under color of state law. (Dkt. 57).

II.     Whether the Court erred in finding that DiDonato has failed to plead sufficient facts showing that she qualifies for either of the two exceptions to this rule pursuant to *DeShaney v. Winnebago Cty. Dep't of Soc. Servs*., 489 U.S. 189, 197 (1989).

III.    Whether the Court erred in finding that DiDonato has failed to plead that Panatera had custody over her, thus requiring Panatera to protect her because no alternate avenues of aid existed.

IV.     Whether the Court erred in finding that DiDonato has failed to plead that Panatera affirmatively placed DiDonato in a position of danger which she would not otherwise have faced.

V.      Whether the Court erred in finding that DiDonato has failed to plead that Panatera imposed upon her a restraint of personal liberty triggering the protections of the Due Process Clause.

VI.     Whether the Court erred in finding that DiDonato has failed to plead that she was not free to leave and seek help on her own.

VII.   Whether the Court erred in finding that the heart of DiDonato's claim is that it was DiDonato's head injury that incapacitated her and not an affirmative action on the part of the State, and ignored acts of Panatera after the head injury which physically and forcefully deprived her of the freedom to seek her own help, and also calculatedly further injured her.

## STATEMENT OF THE CASE

### Nature of the Case

DiDonato's Second Amended Compliant includes five counts. Count IV claims against both Panatera and the City of Chicago for deliberate indifference under 42 U.S.C. § 1983 and Count claims against them for willful and wanton misconduct (Count V). DiDonato also alleges Illinois-state claims against Panatera for negligence (Count I), assault (Count II) and battery (Count III).

The district court granted Panatera and the City of Chicago's motion to dismiss the § 1983 claim in Count IV and dismissed the City of Chicago from the wilful and wanton claim in Count V. (Dkt. 57, p. 12). The district court dismissed the non-federal claims in Counts I through III and Count V against Panatera without prejudice, declining to exercise further supplemental jurisdiction. (Dkt. 57, p. 12).

DiDonato's claims against paramedic/emergency medical technician ("EMT") Panatera begin with a head injury sustained while a guest at his home  and falling in his bathroom. DiDonato was thereafter rendered her immobile, disoriented

3

and nearly unconsciousness. The next afternoon, an ER diagnosed her with head trauma, concussion, and other related symptoms, all of which were immediately and readily apparent to EMT Panatera at the time of the occurrence.

For more than 12 hours after the head injury and before DiDonato was treated in an ER, Panatera failed to provide her with immediate and appropriate medical care, failed to summon and EMT staffed ambulance, and failed to otherwise transport her to a medical health facility. Instead, he picked her off the bathroom floor, put her in his bathtub, washed off blood from her body, took her out of the tub, put her on the bathroom floor, picked her up while she was trying to crawl out of the bathroom, put her in his bed while she was semi-conscious, and shortly thereafter and again the next morning sexually assaulted her.

DiDonato was not allowed the liberty to get out of his bed and leave his home without his assistance, and/or to get to a telephone or her cell phone to call for help. The medical treatment EMT Panatera did provide DiDonato was to wrap a non-sterile towel around her bleeding head and then put her in his bed.

After getting a work call from his EMT partner and telling DiDonato he had to leave, Panatera helped dressed DiDonato, helped put her in his car, and drove her to and left her at her home. DiDonato called a friend who immediately took her to an ER. She was treated with sutures and staples to her head, medication, and instructions for follow-up care. She continues to receive medical and mental care.

4

## Facts

<u>Second Amended Complaint Fact Allegations - Dkt. 37</u>

At all relevant times, Defendant Tim Panatera Defendant Panatera was employed by the City of Chicago as a Paramedic and/or Emergency Medical Technician (EMT). (Dkt. 37 ¶ 8).

On or about March 18, 2018, DiDonato visited Panatera's home located at 6016 S. Merrimac Avenue, Chicago, Illinois. (*Id.* ¶ 9). Panatera drove her there. (*Id.* ¶ 9). Late at night on March 18, 2018, Panatera and DiDonato had been in Panatera's hot tub. (*Id.* ¶ 10). DiDonato was wearing undergarments. (*Id.* ¶ 10). DiDonato left the hot tub and dried her legs and feet to use Panatera's bathroom. (*Id.* ¶ 10). Upon entering the bathroom, DiDonato was caused to slip and fall on the cold floor and hit the back of her head on the tub sustaining severe and permanent injuries. (*Id.* ¶ 10).

Immediately upon and after DiDonato injured herself in Panatera's bathroom, Panatera entered the bathroom and saw DiDonato sitting on the floor next to the bathtub, saw blood flowing from DiDonato, and trained Paramedic/EMT Panatera stated, "Holy shit, that's bad." (*Id.* ¶ 11). DiDonato was immobile, disoriented and confused. (*Id.* at ¶ 12). She could not move herself. (*Id.* at ¶ 12).

Panatera, a trained Paramedic/EMT, was taught the manner in which to begin to attend to DiDonato and her injuries in his bathroom. (*Id.* at ¶ 13).

[A] trained Paramedic/EMT, Panatera picked DiDonato off the floor, placed her in his bathtub, turned on the tub's shower over and about her head and body, and rather than find and treat her wound, rinsed blood from her head and body and keeping the blood off his bathroom floor. (*Id.* at ¶ 14).

Panatera turned off the shower. (*Id.* at ¶ 15). DiDonato remained immobile, disoriented and confused. (*Id.* at ¶ 15). [A] trained Paramedic/EMT, Panatera, facing DiDonato, placed his hands under her arms, lifted her from the tub, and placed her on the bathroom floor. (*Id.* at ¶ 16). Panatera did not clean or cover the bathroom floor before doing so. (*Id.* at ¶ 17).

[A] trained Paramedic/EMT, while DiDonato remained on the bathroom floor, Panatera provided her medical assistance in that he wrapped DiDonato's head with a non-sterile bathroom towel. (*Id.* at ¶ 18).   To Panatera's knowledge, DiDonato could not stand. (*Id.* at ¶ 19). To escape from Panatera's custody, while remaining disoriented, DiDonato got on all fours and attempted to crawl out of the bathroom. (*Id.* at ¶ 20).  Panatera picked up DiDonato, took her to his bed, and laid her upon it. (*Id.*  at ¶ 21). He covered her with a bedsheet. (*Id.*  at ¶ 21). She still had the towel wrapped around her head. (*Id.*  at ¶ 21).

It was late evening of March 18, or very early morning of March 19, 2018. (*Id.* at ¶ 22). DiDonato could not get out of Panatera's bed or stand up. (*Id.* at ¶ 23).

DiDonato, in a state of immobility, disoriented and near unconsciousness, did not have the liberty to get out of Panatera's bed, leave his home or get to a telephone or her cell phone to call for help without Panatera's assistance, all of which Panatera knew when he placed her in his bed and kept her in his house. (*Id.* at ¶ 24).

Rather, Panatera deprived her of the freedom to act. (*Id.* at ¶ 25). Instead, he kept her in his house for his own purposes. (*Id.* at ¶ 25). While remaining immobile and unable to care for herself, DiDonato felt and then observed Panatera assault her by attempting to mount her in a sexual manner to have non-consensual sexual intercourse with her. (*Id.* at ¶ 25). He was on top of her breathing. (*Id.* at ¶ 25). She heard him say, "Fuck, I didn't cum." (*Id.* at ¶ 25). She remembers physical pressure on her body. (*Id.* at ¶ 25). She did not invite Panatera to be on top of her for any reason. (*Id.* at ¶ 25). DiDonato lost consciousness which Panatera knew or as a trained EMT should have known. (*Id.* at ¶ 25).

The next morning on March 19, 2018, DiDonato was still in Panatera's bed. (*Id.* at ¶ 26). She had not gotten out of Panatera's bed. (*Id.* at ¶ 26). At the time, DiDonato is five-foot five inches tall and weighed 123 pounds. (*Id.* at ¶ 26). She was awakened by Panatera placing his bodily pressure on her body and him breathing. (*Id.* at ¶ 26). He had inserted himself in her and was having non-consensual sexual intercourse with her. (*Id.* at ¶ 26). She does not remember if he finished having sex with her. (*Id.* at ¶ 26). DiDonato again lost consciousness and remained in Panatera's

bed until he awakened her about late afternoon on March 19, 2018. (*Id.* at ¶ 27).

On or about March 19, 2018 in the later afternoon, while at Panatera's home and in Plaintiff's presence, Panatera took a phone call from his work partner during which they purportedly engaged in a work-related conversation. (*Id.* at ¶ 28). On information and belief, at the time of the call, Panatera was "on call" through his job as a paramedic with the City of Chicago on March 19, 2018. (*Id.* at ¶ 29).

DiDonato heard Panatera talking on a phone while walking into his bedroom in the afternoon of March 19, 2018. (*Id.* at ¶ 30). He was laughing. (*Id.* at ¶ 30). He told DiDonato it was his partner and that he had to work and that she had to leave. (*Id.* at ¶ 30).

DiDonato could not leave Panatera's home unassisted. (*Id.* at ¶ 31). Panatera told her she had an unsteady gait and knew she required help to leave his home. (*Id.* at ¶ 31). DiDonato does not recall putting her clothes on. (*Id.* at ¶ 32). Panatera put a used fleece hat on her head to cover up or mask the open head wound. (*Id.* at ¶ 32).

DiDonato was still in pain, groggy, and covered with dried blood. Panatera helped her to his car. (*Id.* at ¶ 33). She could not have walked to her car without his assistance. (*Id.* at ¶ 33). Panatera accumulated DiDonato's personal belongings, put a used fleece hat on her head to cover the open head wound and blood in her hair, took her to his vehicle, and drove her from his Chicago home to DiDonato's west suburban place of residence. (*Id.* at ¶ 33). From and after her injury and through the

time that he drove her to her home, the only medical services provided to DiDonato by Panatera was to wrap the non-sterile towel around her head. (*Id.* at ¶ 34).

Panatera kept DiDonato in his home until he drove her to her home. (*Id.* at ¶ 35). At all times, he had control of her in his house and in his car. (*Id.* at ¶ 35). She did not have the freedom to act on her own behalf or provide herself medical care because she was in and out of consciousness, immobile, and disoriented. (*Id.* at ¶ 35).

Upon return to her home, DiDonato contacted a friend for help who immediately drove to DiDonato's place of residence. (*Id.* at ¶ 36). DiDonato's friend observed her open head wound and her blood-dried and matted her. (*Id.* at ¶ 37). DiDonato's friend helped her to his automobile and drove her to the Adventist Hinsdale Hospital Emergency Room ("ER"). (*Id.* at ¶ 37).

At the ER, DiDonato was diagnosed with head trauma, concussion, and other related symptoms. (Id. at ¶ 38). She was treated with sutures and staples to her head, medication, and instructions for continuing and follow-up care. (Id. at ¶ 38). Thereafter, DiDonato sought and received and continues to receive medical and mental care. (Id. at ¶ 38).

## SUMMARY OF ARGUMENT

First, the district court's Memorandum and Opinion excludes fact allegations directly relevant to the Count IV Section 1983 claim motion to dismiss analysis.

Second, the district court focuses upon DiDonato's initial head injury. The court lays less emphasis upon the second set of facts, that is, the acts of Panatera in prohibiting or limiting DiDonato's medical care, deprivation of her liberty, and additional physical and mental injury inflicted upon DiDonato in Panatera's satisfaction of his prurient interests vis-à-vis two non-consensual sexual assault.

In ruling upon this Motion to Dismiss where all well-pleaded facts are deemed true, the Court erred in finding that Plaintiff-Appellant DiDonato's Count IV Section 1983 claims against Panatera and the City of Chicago failed to show that Panatera acted under color of state law. (Dkt. 57). DiDonato has plead sufficient facts showing that she qualifies for either of the two exceptions under *DeShaney v. Winnebago Cty. Dep't of Soc. Servs*., 489 U.S. 189, 197 (1989). DiDonato has sufficiently plead that Panatera had custody over her, requiring him to protect her because no alternate avenues of aid existed. Donato has sufficiently plead that Panatera affirmatively placed DiDonato in a position of danger the she would not otherwise have faced. DiDonato sufficiently plead that Panatera imposed upon her a restraint of personal liberty triggering the protections of the Due Process Clause.  DiDonato sufficiently plead that she was not free to leave and seek help on her own, and increased or cause new and greater injury, physical and mental. Thus, DiDonato sufficiently  plead that there was an affirmative action on the part of the state that would meet one of the *DeShaney* exception. The heart of this Section 1983 claim is that Panatera as

rendered inadequate medical assistance, knowingly and deliberately causing her to remain in his personal bed in a semi-conscious incapacitated state while he took affirmative action in aggravating and increasing her physical and mental damage while forcefully rendered deprived her of freedom to seek her own help. The Section 1983 and wilful and wanton claim is not head injury, but everything thereafter that Panatera inflicted upon her under color of state law. The complaint alleges he was on call during the assaults. For propose of the motions to dismiss, that allegation must be taken as true.

## STANDARD OF REVIEW

The factual allegations in DiDonato's Second Amended Complaint and are assumed true for purposes of a motion to dismiss. *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016). When considering a motion to dismiss a complaint on the basis of qualified immunity, the court must accept all allegations in the complaint as true, construing them in the light most favorable to the plaintiff. *Harrell v. Cook*, 169 F.3d 428, 431 (7th Cir.1999); *Martinez v. Hooper*, 148 F.3d 856, 858 (7th Cir.1998). (internal quotation marks omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court is required to accept the complaint's factual allegations as true and draws all permissible inferences in

Plaintiffs' favor. *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 678).

In the United States Court of Appeals for the Seventh Circuit, a district court's grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)") is re-viewed de novo. *Manistee Apartments, LLC v. City of Chi.*, 844 F.3d 630, 633 (7th Cir. 2016). In so doing, the Seventh Circuit "assume[s] all well-pleaded allegations are true and draw[s] all reasonable inferences in the light most favorable to the plaintiff." *Id.*

## ARGUMENT

### I. Fact Allegations Ignored by the District Court which with the Allegation Noted by the Court Demonstrate that Panatera acted under Color of State Law

The court excluded the following significant fact allegations excluded in its Memorandum Opinion (Dkt. 57). While the district court appears to deem some of the following as conclusory allegations, they represent what DiDonato thoughts and recollections which allegations are deemed true.

The court may infer that a trained EMT would recognize the signs of concussion or possible concussion and immediately initiate a concussion protocol. Panatera would or should know on observation that: DiDonato was immobile, disoriented and confused. (Dkt. 37 ¶ 12); and could not move herself. (*Id.* at ¶ 12).

It can be inferred that Panatera, a trained Paramedic/EMT, was taught the manner in which to begin to attend to DiDonato and her injuries in his bathroom.

(*Id.* at ¶ 13). [Instead, he put her in the bathtub,] and then turned off the shower. (*Id.* at ¶ 15). DiDonato remained immobile, disoriented and confused. (*Id.* at ¶ 15). Panatera, facing DiDonato, placed his hands under her arms, lifted her from the tub, and placed her on the bathroom floor. (*Id.* at ¶ 16).

Panatera did not clean or cover the bathroom floor before doing so. (*Id.* at ¶ 17). To Panatera's knowledge, DiDonato could not stand. (*Id.* at ¶ 19). To escape from Panatera's custody, while remaining disoriented, DiDonato got on all fours and attempted to crawl out of the bathroom. (*Id.* at ¶ 20).

[Other than wrapping a non-sterile towel around her head,] Panatera picked up DiDonato, took her to his bed, and laid her upon it. (*Id.* at ¶ 21). He covered her with a bedsheet. (*Id.* at ¶ 21). She still had the towel wrapped around her head. (*Id.* at ¶ 21). It was late evening of March 18, or very early morning of March 19, 2018. (*Id.* at ¶ 22), and DiDonato was in a state of immobility, disoriented and near unconsciousness; she did not have the liberty to get out of Panatera's bed; she did not have the liberty to leave his home or get to a telephone or her cell phone to call for help without Panatera's assistance. (*Id.* at ¶ 24). DiDonato again lost consciousness and remained in Panatera's bed until he awakened her about late afternoon on March 19, 2018. (*Id.* at ¶ 27).

Panatera kept DiDonato in his home until he drove her to her home. (*Id.* at ¶ 35).  At all times, he had control of her in his house and in his car. (*Id.* at ¶ 35). She

did not have the freedom to act on her own behalf or provide herself medical care because she was in and out of consciousness, immobile, and disoriented. (*Id.* at ¶ 35).

DiDonato's friend helped her to his automobile and drove her to the Adventist Hinsdale Hospital Emergency Room ("ER"). (*Id.* at ¶ 37). At the ER, DiDonato was diagnosed with head trauma, concussion, and other related symptoms. (*Id.* at ¶ 38). She was treated with sutures and staples to her head, medication, and instructions for continuing and follow-up care. (*Id.* at ¶ 38). Thereafter, DiDonato sought and received and continues to receive medical and mental care. (*Id.* at ¶ 38).

## II.    DiDonato Pleads Sufficient Facts to Qualify for the *DeShaney* Exceptions

Following the district court's analysis, to bring a Section 1983 claim, DiDonato must show that she was deprived of a right secured by the Constitution or laws of the United States and that the alleged deprivation was committed by a person acting under the color of state law. *Rodriguez v. Plymouth Ambulance Servs.*, 577 F.3d 816, 822 (7th Cir. 2009). Here, DiDonato alleges that Panatera was on call on information and belief and that she heard him telephonically engage with his EMT partner. It is correct that the law is that the government generally has no constitutional duty to provide medical or rescue services to its citizens. *See, Doe v. Vill. of Arlington Heights*, 782 F.3d 911, 916 (7th Cir. 2015) (citing *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989)).

However, *Doe*, cited by the court here, relies upon *DeShaney* wherein the court held that the purpose of the Due Process Clause "was to protect the people from the State, not to ensure that the State protected them from each other." *DeShaney* at 196. DiDonato needed to be protected from Panatera, the State.

Due process "generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *Id.* But, in *DeShaney*, there was an assault by private, third-party actors. Those are not the facts alleged here.

Under the two *DeShaney* exceptions, liability exists (1) when the state has a " 'special relationship' " with the person such as "when it has custody over a person, it must protect him because no alternate avenues of aid exist," and (2) under the state-created danger exception, "liability exists when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have faced." *Id.*

## III.    DiDonato Pleads That Panatera Had Custody Over Her, Requiring His Protection Because No Alternate Avenues of Aid Existed

Here, Panatera "took custody over" DiDonato and thus a "special relationship" existed. It is clear from the allegations, inclduing those that the court omitted, that Panatera had to protect since she had "no alternate avenues of aid."

In *Buchanan–Moore v. Cnty. of Milwaukee,* 570 F.3d 824, 827 (7th Cir.2009) (quoting *Monfils v. Taylor,* 165 F.3d 511, 516 (7th Cir.1998) and *Slade v. Bd. of Sch. Dirs. of Milwaukee,* 702 F.3d 1027, 1030 (7th Cir.2012), this court in considering so-called "special relationship" and "trap" cases states that "[a]ll acts are affirmative, including standing still when one could save a person by warning him of some impending danger."

In order for the Due Process Clause to impose upon the state the duty to protect its citizens, the state [via Defendant Panatera], by his affirmative acts, must create or increase a danger faced by Plaintiff DiDonato an individual. Panatera's failure to protect DiDonato from such a danger must be the proximate cause of her injury. And Panatera's failure to protect DiDonato must shock the conscience.

DiDonato's complaint must allege facts suggesting that the City's conduct vis-à-vis Panatera was the proximate cause of her suffering; that is, DiDonato must have been a foreseeable victim of the Panatera's acts. Certainly, it would be foreseeable to Panatera, an EMT, that failure to treat a bloody head injury would cause her suffering. It would be foreseeable to him that sexually assaulting DiDonato would cause her suffering.

As discussed in *Buchanan*, in *Reed v. Gardner,* 986 F.2d 1122 (7th Cir.1993), a drunk driver crossed the center line of the highway and crashed into the Reeds' car. Earlier that day, police had arrested the original driver of the car, leaving a drunk

passenger behind. Based on the appellant's allegation that the officers removed a sober driver from the driver's seat and knowingly replaced him with an intoxicated driver, the court found that the plaintiffs had sufficiently stated a claim that the state affirmatively created a danger for the other drivers on the road and that the plaintiffs were foreseeable victims. The *Reed* court noted that foreseeability hinged on the fact that the dangers presented by drunk drivers were familiar and specific; in addition, the threat of harm to other motorists was limited in both time and scope. *Reed,* 986 F.2d at 1127. The court in *Buchanan* noted that no such limiting factors were present there; that in *Reed,* the police could be expected to know that the intoxicated man they placed behind the wheel suffered from impaired judgment and diminished motor skills; these were dangers both familiar and specific that the police chose not to heed. While in *Buchanan*, the court found that the complaint did not allege facts suggesting that the perpetrator's access to a gun, or propensity toward homicide, were specific dangers that were familiar to the County but rather unpredictable rather than legally foreseeable."

Here, the complaint alleges that Panatera, a paramedic, knew by his assumption to treat, failure to perfom the necessary duties of a paramedic in further treating and/or removing her to an ambulance and/or hospital, and placing and keeping her in his own bed for hours and then twice sexually assaulting DiDonato, DiDonato, as distinguished from the public at large, faced special danger. This was

no generalized, amorphous situation.

As alleged, it was knowing and deliberate. DiDonato was a foreseeable victim as Panatera's alleged knowing and deliberate conduct defines and was to trigger his paramedic-trained state duty to protect DiDonato and not make her dire situation worse in his feeble attempt to treat her head by wrapping it in a dirty towel and not transporting her either via ambulance or his own personal vehicle to a medical facility. Indeed, it is alleged she attempted to crawl out of the bathroom, he intercepted her, carried her to his bed, covered her, and kept her there long enough to twice sexually assault her, re-clothed her, packed her belongings, helped her to his car, covered her head with a tam, and still did not take her for medical treatment but rather left her to fend for herself at her own home. She called a friend, who went to her home and immediately took her to an emergency room. While not alleged, it can be inferred that a paramedic is, in the least, trained to address a bleeding headwound and pursue a concussion protocol, which Panatera did not perfom. Furthermore, like in *Reed,* the danger was of limited duration. Proximate cause is a fact specific inquiry, involving a consideration of time, geography, range of potential victims, and the nature of harm that occurred." Perhaps it can be said that if the County had not released Gray when it did, Moore would be alive today. However, the facts as alleged amount to only a "but-for" causal link, they do not state a claim that Moore's death was proximately caused by the County's acts. Moore's death was

simply too remote a consequence of the County's actions to hold the County responsible under the federal civil rights law.

### IV.    DiDonato Has Pleaded That Panatera Placed Her in A Position of Danger Which She Would Not Otherwise Have Faced.

As stated in *Hernandez v. City of Goshen, Ind.,* 324 F.3d 535, 538 (7th Cir.2003) the exception applies where the state creates or increases a danger to an individual, citing *Sandage v. Bd. of Comm'rs,* 548 F.3d 595, 598–99 (7th Cir.2008) ("had it not been for the state's inaction in *DeShaney,* there would have been no injury"). The court also notes in *Paine v. Cason,* 678 F.3d 500, 510 (7th Cir.2012), that "people propelled into danger by public employees have a good claim under the Constitution." Here, the action began with a severe head injury in Panatera's bathroom followed by Panatera, a public employee while treating DiDonato, took advantage of her incapacity and "propelled" her into further physical and mental danger. As the court notes from *Sandage*, to " 'create or increase' must not be interpreted so broadly as to erase the essential distinction between endangering and failing to protect" and thus circumvent *DeShaney's* general rule. *Sandage,* 548 F.3d at 599 (citation and emphasis omitted). "When courts speak of the state's 'increasing' the danger of private violence, they mean the state did something that turned a potential danger into an actual one, rather than that it just stood by and did nothing to prevent private violence." *Id.* at 600.

In *White v. Rochford,* 592 F.2d 381, 382 (7th Cir.1979), the police arrested a

driver for drag racing and left the children passengers stranded alone in the car on a busy highway on a cold night. In *Reed v. Gardner,* 986 F.2d 1122, 1127 (7th Cir.1993), police officers could be held liable under the state-created danger exception where they arrested a sober driver and left behind an obviously drunk passenger with the keys to the vehicle who later caused a collision, injuring the plaintiffs.

In *Monfils v. Taylor,* 165 F.3d 511 (7th Cir. 1998) a police officer took responsibility preventing release of a tape recording of an informant's anonymous tip but then went deer hunting instead of taking standard steps to prevent the tape's release despite knowing that the release would place the informant in heightened danger, and the informant was killed. Here, Panatera, a trained EMT took responsibility to comfort DiDonato but then knowingly ignored her condition and medical needs and instead twice sexually assaulted her while she was unconscious or semi-conscious instead of "taking standard steps to prevent" further injury to DiDonato, instead committed assault and battery upon her.

*Paine v. Cason,* 678 F.3d 500, 510 (7th Cir.2012)*,* the police arrested a woman in a safe place and released her into a hazardous one while she was unable to protect herself. There, as here, the perpetrator met potential danger and turned it into an actual one. *Id.*

Here, Panatera kept an immobile DiDonato within in his control in his house,

in his bed, and created a greater danger or exacerbated her condition. The court incorrectly ruled that DiDonato does not plead any facts relating to the state-created danger exception, while ignoring several relevant allegations to that exception. (See, Dkt. 51 at 2; Dkt. 52 at 3). Citing *DeShaney*, 489 U.S. at 200; *see also Salazar v. City of Chicago*, 940 F.2d 233, 237 (7th Cir. 1991), if a person is "free to leave and seek help on his own," he is not in custody for purposes of the *DeShaney* exception. DiDonato was not free to leave and seek help on her own, while an EMT kept her in his custody.

Consider the following. Panatera eventually put her in his car and took her home since she was not capable of doing so. After the first sexual assault, he could have done just that. Instead, he continued to keep her under his custody and control and again sexually assaulted her. She was not free to leave and seek help on her own until he decided it was time.

In *Salazar, Id*, the 7th Cir found that district court decided that the paramedics and police officers could be liable only if they were "deliberately indifferent" to Salazar's medical needs, defining deliberate indifference in jury instructions in the paramedics' case as follows: "To establish that the defendants' failure to provide medical care for Alejandro Salazar was sufficiently blameworthy to violate constitutional guarantees ... plaintiff must prove ... that the defendants had actual knowledge that there was a substantial risk that Alejandro Salazar might die or suffer

grievous harm if additional medical services were not provided and that the defendants, despite such knowledge, deliberately imposed such a risk on Mr. Salazar." Panatera put DiDonato in increased danger with significant risk that she would suffer grievously. He was not only indifferent to the risk, he knowingly and deliberately perpetrated it.

## V.    DiDonato Pleaded That Panatera imposed upon Her a Restraint of Personal Liberty Triggering the Protections of the Due Process Clause

The court incorrectly found that DiDonato's claims failed because she does not "show" that there was an affirmative action on the part of the state that would meet the *DeShaney* exception, and that "nothing she alleges indicates that she was incarcerated, institutionalized, or under a similar restraint of personal liberty."

As the court notes, DiDonato alleges that Panatera was acting under color of state law because he engaged in a work-related call which "presumed he was on-call at the time." ( Dkt. 51 at 3; Dkt. 52 at 2). Additionally, DiDonato alleges that in performance of his official duties, Panatera "provided medical assistance to DiDonato by wrapping her head in a towel." (Dkt. 51 at 4; Dkt. 52 at 2-3). She further claims that Panatera was "acting through his official duties as a paramedic when he first determined the severity of her injuries by stating 'Holy shit, that is bad." (Dkt. 52 at 3).

## VI.    DiDonato Pleaded She Was Not Free to Leave and Seek Help on Her Own

The court determined that vis-à-vis failure to adequately treat DiDonato put

Panatera in the role of bystander rather than paramedic and his actions or inactions were not taken under color of law, while the court ignores that he was not passive but rather restrained her and/or held under his custody until he decided to free from his home but getting her up, dressing her, helping her to his car and dropping her at her home rather than transport her to a medical facility, which he just as easily could have done at any time immediately after her head injury.

The lower court citing *Doe v Vill. of Arlington Heights*, No. 11 C 2764, 2012 WL 1068787, at *8 (N.D. Ill. March 29, 2019), aff'd on other grounds, 782 F.3d 911 (7th Cir. 2015) incorrectly contends that DiDonato fails to "show" that she was under a restraint of personal liberty similar to being incarcerated or institutionalized, citing *Jackson v. Schultz*, 429 F.3d 586, 590 (6th Cir. 2005).

**VII.    DiDonato's Head Injury, while Incapacitating Her, is not the Heart of Her Section 1983 Claims; Rather it is Panatera's Subsequent Action and Inaction that Followed, Increasing and Exacerbating the Deprivation of Her Freedom, Denied Her Medial Help, and Caused Her Further Damage**

The court contends that "the heart of this claim is that it was DiDonato's head injury that incapacitated her and not an affirmative action on the part of the State." (Dkt. 34 at 5). The court further states, "DiDonato alleges that she was unconscious at times as a result of her head trauma, so the Court accepts that she could not easily leave Panatera's home or seek help. Yet it was her head injury that made her unable to leave or seek help, not any affirmative act, show of force, or show of authority by the state." *See Jackson*, 429 F.3d at 591 (unconscious patient was not in paramedics'

23

custody after being placed in an ambulance where paramedics did not restrain him in any way, and his "liberty was 'constrained' by his incapacity, [which] was in no way caused by" the paramedics. Here, DiDonato alleges that woke up to Panatera on top of her, pinning her down, and sexually assaulting her while in a semi-conscious state. It has puzzling  that the court would contend that DiDonato plaintiff was not in custody where she was never "physically restrained by the state", she did not allege that the defendant "did anything to cause her intoxication, which limited her capacity to seek help on her own." Again, the court seems to blame DiDonato for the EMT's failure to treat her, being paced in his bed, but then keeping her in his apartment to assault her. Based you the court's logic, that was her fault as well.

To state a claim, the complaint need only contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). According to the Seventh Circuit, the complaint must describe the claim in sufficient detail to give the defendant "fair notice of what the ... claim is and the grounds upon which it rests." *E.E.O.C. v. Concentra Health Servs.,* 496 F.3d 773, 776 (7th Cir.2007), *quoting Bell Atlantic Corp. v. Twombly,* --- U.S. ----, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007). Second, the factual allegations must "plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level'; if they do not, the plaintiff pleads itself out of court." *Id.* Paramedics have a duty to provide medical care to individuals in police custody);

*Salazar v. City of Chicago,* 1985 WL 2482, No. 84 C 10156 (N.D.Ill. Sep. 09, 1985) (paramedics acted under color of state law when deciding whether to treat the plaintiff). DiDonato has more than adequately pleaded her Section 1983 claim and her claim against the City of Chicago for wilful and wanton conduct.

## CONCLUSION

The court erred in focusing upon DiDonato's head injury and laying to the side and ignoring allegations which establish her Section 1983 claims and her claim against the City of Chicago for wilful and wanton conduct.

Accordingly, this Court should reverse the district court's dismissal of the Second Amended Complaint and remand the case for proceedings in accordance therewith.

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.    The brief complies with the type-volume limitations of Fed. R. App. P. 32(e) and Cir. R. 32(c) because, excluding the parts of the document exempted by Rule 32(f), this brief contains 6,281 words.

2.    The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because: this brief has been prepared in proportionally spaced typeface using Microsoft Word Times New Roman, 14-point.

## STATEMENT THAT ALL REQUIRED MATERIALS ARE IN APPENDIX

In accordance with Seventh Cir. R. 30(d), I certify that all documents required by Seventh Cir. R. 30(a) are included in this Short Appendix bound with Appellant's Brief and that all documents required by Seventh Cir. R. 30(b) also are included with this short appendix to the Brief.

/s/ Nicholas F. Esposito
Nicholas F. Esposito
Bradley K. Staubus
ESPOSITO & STAUBUS LLP
7055 Veterans Blvd., Unit B
Burr Ridge, Illinois 60527
Telephone: (312) 346-2766
Facsimile : (312) 346-3177
Attorneys for Kylie DiDonato

## CERTIFICATE OF SERVICE

I certify that on January 12, 2021, a copy of this document was electronically filed. Notice of this filing will be sent to all counsel of record by operation of the Court's Electronic Filing System.

/s/ Nicholas F. Esposito
Nicholas F. Esposito

# APPENDIX

## TABLE OF CONTENTS TO
## <u>CIRCUIT RULE 30(A) & (B) SHORT APPENDIX</u>

Judgment in a Civil Case (Dkt. 58) dated February 20, 2020……………..App. 001

Memorandum Opinion and Order (Dkt. 57) dated February 20, 2020…….App. 002

Second Amended Complaint (Dkt. 37) dated September 13, 2019………..App. 014

ILND 450 (Rev. 10/13) Judgment in a Civil Action

## IN THE UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF ILLINOIS

Kylie DiDonato,

Plaintiff(s),

v.

Tim Panatera and City of Chicago ,

Defendant(s).

Case No.  19 C 2737
Judge Virginia M. Kendall

## JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐　in favor of plaintiff(s)
　　and against defendant(s)
　　in the amount of $　　　　,

　　　　　which ☐ includes 　　　 pre–judgment interest.
　　　　　　　　☐ does not include pre–judgment interest.

　　Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

　　Plaintiff(s) shall recover costs from defendant(s).

---

☒　in favor of defendant(s) Tim Panatera and City of Chicago
　　and against plaintiff(s) Kylie DiDonato

.

　　Defendant(s) shall recover costs from plaintiff(s).

---

☐　other:

---

This action was *(check one)*:

☐ tried by a jury with Judge 　　 presiding, and the jury has rendered a verdict.
☐ tried by Judge 　　 without a jury and the above decision was reached.
☒ decided by Judge Virginia M. Kendall on a Motions to Dismiss.

Date:　2/28/2020

Thomas G. Bruton, Clerk of Court

/s/Lynn Kandziora, Deputy Clerk

**App. 001**

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| KYLIE DIDONATO, | ) | |
| | ) | |
| | ) | |
| *Plaintiff,* | ) | No.  19 C 2737 |
| | ) | |
| v. | ) | Judge Virginia M. Kendall |
| | ) | |
| TIM PANATERA and | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| *Defendants.* | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This is Plaintiff Kylie DiDonato second attempt to assert a constitutional claim against paramedic/emergency medical technician ("EMT") Tim Panatera and the City of Chicago for a head injury that occurred in Panatera's bathroom.  DiDonato alleges that after suffering the head injury, Panatera failed to deliver appropriate medical care and sexually assaulted her while she was in and out of consciousness.  The Court originally granted Defendants' motion to dismiss because DiDonato failed to establish a Section 1983 claim—her jurisdictional link to federal court . (Dkt. 34).  The Court granted DiDonato leave to amend, which she did.  (Dkt. 37).  Defendants have now moved to dismiss DiDonato's Second Amended Complaint, again arguing that Plaintiff has failed to state a federal claim.  (Dkt. 40, 43).  Defendant City of Chicago separately moves to dismiss Panatera's willful and wanton misconduct claim.  Defendant Panatera also argues that DiDonato has failed to comply with pleading

**App. 002**

requirements and moves in the alternative to strike portions of DiDonato's Second Amended Complaint.

## BACKGROUND

The following factual allegations are taken from DiDonato's Second Amended Complaint (Dkt. 34) and are assumed true for purposes of this motion. *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016).

Defendant Tim Panatera is a paramedic/EMT employed by the City of Chicago. (Dkt. 37 ¶ 8). On or about March 18, 2018, DiDonato visited Panatera's home in Chicago, Illinois after Panatera drove her there. (*Id.* at ¶ 9). On the night of March 18, 2018, Panatera and DiDonato went into Panatera's hot tub. (*Id.* at ¶ 10). At some point, DiDonato left the hot tub, drying her feet and legs, to use Panatera's bathroom. (*Id.* at ¶ 10). While in the bathroom, DiDonato slipped and fell, hitting the back of her head on the bathtub. (*Id.*)

Panatera entered the bathroom after DiDonato fell, saw DiDonato bleeding on the floor next to the bathtub, and said "Holy shit, that's bad." (*Id.* at ¶ 11). Panatera then attended to DiDonato's injuries, picking her up and placing her in the bathtub to rinse the blood from her head. (*Id.* at ¶ 14). Panatera then lifted DiDonato from the bathtub, placed her on the floor, and wrapped her head with a non-sterile bathroom towel. (*Id.* at ¶ 18). DiDonato then attempted to crawl out of the bathroom. (*Id.* at ¶ 20). Panatera picked up DiDonato, took her to his bed, laid her upon it and then covered her with a bedsheet. (*Id.* at ¶ 21). DiDonato could not get out of

**App. 003**

Panatera's bed or stand up. (*Id.* at ¶ 23). While immobile and unable to care for herself, DiDonato felt and then observed Panatera "assault her by attempting to mount her in a sexual manner to have non-consensual sexual intercourse with her." (*Id.* at ¶ 25). DiDonato then lost consciousness. (*Id.* at ¶ 25). The next morning on March 19, 2018, DiDonato was awakened by Panatera's body on top of hers, again having non-consensual intercourse with her. (*Id.* at ¶ 26).

Later in the afternoon of March 19, 2018, Panatera took a phone call from his work partner during which they allegedly "engaged in a work-related conversation." (*Id.* at ¶ 28). DiDonato alleges that Panatera was "on call" that day for his job as a paramedic. (*Id.* at ¶ 29).

DiDonato left Panatera's home that same afternoon, although she was unable to do so without assistance and did not recall putting her clothes on. (*Id.* at ¶ 31-32). DiDonato was in pain and groggy when Panatera helped her to his car, gathered her belongings, and put a fleece hat over her head before driving her to her home. (*Id.* at ¶ 33). DiDonato states that "from and after her injury and through the time that he drove her to her home, the only medical services provided to DiDonato by Panatera was to wrap the non-sterile towel around her head. (*Id.* at ¶ 34). When she got home, DiDonato contacted a friend who took her to the Adventist Hinsdale Hospital emergency room. (*Id.* at ¶ 36-37). DiDonato was treated for head trauma, concussion, and other related symptoms. (*Id.* at ¶ 38).

DiDonato filed suit against Panatera in the Circuit Court of Cook County on December 7, 2018. (*See* Dkt. 17). She filed an amended complaint on March 18,

**App. 004**

2019, adding the City of Chicago as a defendant. (Dkt. 1-1). She brings claims against Panatera for negligence (Count I), assault (Count II), and battery (Count III), and claims against both Panatera and the City of Chicago for deliberate indifference under 42 U.S.C. § 1983 (Count IV) and willful and wanton misconduct (Count V). The City of Chicago timely removed the case to this Court. *See* 28 U.S.C. § 1441(a); 1446. Panatera and the City of Chicago now separately move to dismiss the Section 1983 claim under Rule 12(b)(6). Defendant City of Chicago moves under Rule 12(b)(6) to dismiss Panatera's willful and wanton misconduct claim. Defendant Panatera moves in the alternative to strike portions of Plaintiff's Second Amended Complaint pursuant to Rule 12(f).

### LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Court accepts the complaint's factual allegations as true and draws all permissible inferences in Plaintiffs' favor. *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 678). The Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Olson v. Champaign Cty., Ill.*, 784 F.3d 1093, 1099 (7th Cir. 2015) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). However,

**App. 005**

"[w]hile a plaintiff need not plead 'detailed factual allegations' to survive a motion to dismiss, she still must provide more than mere 'labels and conclusions or a formulaic recitation' of the elements of a cause of action' for her complaint to be considered adequate under [Rule] 8." *Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 678). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Toulon v. Cont'l Cas. Co.*, 877 F.3d 725, 734 (7th Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678).

## DISCUSSION

Defendants previously moved to dismiss DiDonato's claims and this Court granted that motion for failure to plead a Section 1983 claim, but gave leave to amend the complaint, which DiDonato timely did. (Dkt. 34). While DiDonato alleges new facts in her Second Amended Complaint, the basis of her Section 1983 claim remaining the same. DiDonato alleges that Panatera intentionally failed to provide her with necessary medical care in violation of her constitutional rights, although she does not name which constitutional article or amendment has been violated. (Dkt. 37 at ¶ 61). Both Defendants argue that DiDonato's claim fails as there is generally no constitutional right to medical care and Plaintiff has failed to plead sufficient facts showing that she qualifies for either of the two exceptions to this rule. Panatera separately argues that there was no state-created danger and that Panatera was not acting under color of state law during the alleged events.

5

**App. 006**

## I.     The *DeShaney* Exceptions

The Court provides only a brief summary of the *DeShaney* exceptions as the case law remains the same from the first Memorandum and Order. (Dkt. 34 at 4-5). To bring a Section 1983 claim, DiDonato must show that she was deprived of a right secured by the Constitution or laws of the United States and that the alleged deprivation was committed by a person acting under the color of state law. *Rodriguez v. Plymouth Ambulance Servs.*, 577 F.3d 816, 822 (7th Cir. 2009). The government generally has no constitutional duty to provide medical or rescue services to its citizens. *Doe v. Vill. of Arlington Heights*, 782 F.3d 911, 916 (7th Cir. 2015) (citing *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989)). There are two exceptions to this general rule: "First, the state is duty-bound to protect individuals with whom it has a special relationship; that is, when a state has custody over a person, it must protect him because no alternate avenues of aid exist. Second, the so-called state-created danger exception provides that liability exists when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have faced." *Buchanan Moore v. Cty. of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009) (internal quotations omitted) (citing *Monfils v. Taylor*, 165 F.3d 511, 516 (7th Cir. 1998)); *see also Doe*, 782 F.3d at 916-17.

DiDonato does not plead any facts relating to the state-created danger exception but argues that she falls under the custody exception. (Dkt. 51 at 2; Dkt. 52 at 3). "[I]t is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar

6

**App. 007**

restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause." *DeShaney*, 489 U.S. at 200; *see also Salazar v. City of Chicago*, 940 F.2d 233, 237 (7th Cir. 1991) (if a person is "free to leave and seek help on his own," he is not in custody for purposes of the *DeShaney* exception). Other examples where the custody exception triggers a constitutional duty includes foster children and pre-trial detainees. *Jackson v. Schultz*, 429 F.3d 586, 590 (6th Cir. 2005). Courts have reasoned that people in state custody "are unable to provide for basic human needs like food, clothing, shelter, medical care, and reasonable safety." *Kitzman-Kelley v. Warner*, 203 F.3d 454, 458 (7th Cir. 2000).

DiDonato's arguments that she was in custody remain largely the same as those in the Amended Complaint. (Dkt. 1-1). DiDonato states that she was in custody at several times. She states she was first in custody when, while attempting to crawl out of the bathroom, Panatera exerted control over her by picking her up and carrying her to his bed. (Dkt. 51 at 2-3; Dkt. 51 at 3). Next, DiDonato alleges that by covering her with a bedsheet, it was impossible for her to get out of bed and stand up, that she did not have access to her cell phone, nor could she get up to access it. *Id.* Additionally, DiDonato claims that she was in custody when Panatera was on top of her and assaulting her. (Dkt. 51 at 3; Dkt. 52 at 3).

Plaintiff must show that there was a state action applying force with the intent to obtain control over her person. *Jackson v. Schultz*, 429 F.3d 586, 590 (6th Cir. 2005). Here, DiDonato's claims fail because she does not show that there was an affirmative action on the part of the state that would meet the *DeShaney* exception.

7

**App. 008**

Nothing she alleges indicates that she was incarcerated, institutionalized, or under a similar restraint of personal liberty.  While DiDonato can show moments where she was restrained by Panatera, such as when she was picked up by Panatera or during her assault, these do not accord with precedent on state custody.  *See Jackson*, 429 F.3d at 591 (unrestrained unconscious patient placed in paramedics ambulance was not in custody); *Doe v Vill. of Arlington Heights*, No. 11 C 2764, 2012 WL 1068787, at *8 (N.D. Ill. March 29, 2019), aff'd on other grounds, 782 F.3d 911 (7th Cir. 2015) (plaintiff who was never "physically restrained by the state" was not in custody).  DiDonato fails to show that she was under a restraint of personal liberty similar to being incarcerated or institutionalized.  *Jackson v. Schultz*, 429 F.3d 586, 590 (6th Cir. 2005).

As with the Amended Complaint, the heart of this claim is that it was DiDonato's head injury that incapacitated her and not an affirmative action on the part of the State.  (Dkt. 34 at 5).  DiDonato alleges that she was unconscious at times as a result of her head trauma, so the Court accepts that she could not easily leave Panatera's home or seek help.  Yet it was her head injury that made her unable to leave or seek help, not any affirmative act, show of force, or show of authority by the state.  *See Jackson*, 429 F.3d at 591 (unconscious patient was not in paramedics' custody after being placed in an ambulance where paramedics did not restrain him in any way, and his "liberty was 'constrained' by his incapacity, [which] was in no way caused by" the paramedics); *Doe v Vill. of Arlington Heights*, No. 11 C 2764, 2012 WL 1068787, at *8 (N.D. Ill. March 29, 2019), aff'd on other grounds, 782 F.3d 911

**App. 009**

(7th Cir. 2015) (plaintiff was not in custody where she was never "physically restrained by the state" and she did not allege that the defendant "did anything to cause her intoxication, which limited her capacity to seek help on her own").

Because DiDonato has failed to plead sufficient facts to show she was in custody, this prong of the *DeShaney* exception is not met, and her claim therefore fails.

## II.   Acting Under Color of State Law

Panatera separately argues that DiDonato's Section 1983 claim fails as DiDonato has not pleaded facts to show that Panatera was acting under color of state law during the alleged acts.  "Not every action by a state official or employee is to be deemed as occurring under color of state law; rather, action is taken under color of state law when it involves a misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Wilson v. Price*, 624 F.3d 389, 392 (7th Cir. 2010) (internal quotations and citations omitted).  "A public employee's acts occur under color of state law when they relate to official duties."  *Luce v. Town of Campbell*, Wisc., 872 F.3d 512, 514 (7th Cir. 2017). "Section 1983 does not cover disputes between private citizens, even if one happens to be an officer."  *Plaats v. Barthelemy*, 641 F. App'x 624, 626-27 (7th Cir. 2016); *see also Wilson*, 624 F.3d at 394 (a private citizen is not liable under Section 1983 unless the citizen becomes a public officer pro tem or conspires with a public employee to deprive a person of his constitutional rights).

**App. 010**

DiDonato alleges that Panatera was acting under color of state law because he engaged in a work-related call which "presumed he was on-call at the time." (Dkt. 51 at 3; Dkt. 52 at 2). Additionally, DiDonato alleges that in performance of his official duties, Panatera "provided medical assistance to DiDonato by wrapping her head in a towel." (Dkt. 51 at 4; Dkt. 52 at 2-3) She further claims that Panatera was "acting through his official duties as a paramedic when he first determined the severity of her injuries by stating 'Holy shit, that is bad.'"[1] (Dkt. 52 at 3).

Further, the Court previously noted that even if the Court were to infer from the allegations that Panatera was on call when DiDonato was injured, that does not end the inquiry of whether he was acting under color of state law. (Dkt. 34 at 7). Therefore, although in her Second Amended Complaint DiDonato has added additional facts about the timing of the work-related call Panatera received, this does not resolve the question of whether he was acting under the color of state law. (Dkt. 51 at 3; Dkt. 52 at 2)

Again, the only discernable act that DiDonato has alleged that relates to Panatera's duties as a paramedic is that he wrapped DiDonato's head wound in a towel. As stated previously by the Court, treating a bleeding person's wound is the sort of thing a paramedic does as part of his official duties. (Dkt. 34 at 8). Opposed to what DiDonato argues, however, Panatera's stating "Holy shit, that is bad" does

---

[1] DiDonato, in her response to Panatera's motion to dismiss, alleges additional facts from the Second Amended Complaint to add that Panatera left DiDonato on the bathroom floor and that he began exiting the bathroom without her when she told him "This is bad, I need help," to which Panatera replied "It's not that bad, you will be okay." (Dkt. 52 at 5). DiDonato does not state whether she believes this was also an official duty, although it tends to undermine Plaintiff's allegation that Panatera's initial exclamation upon seeing her injury was an official act as paramedic if he contradicted himself moments later.

not constitute an official act of a paramedic as he was not officially diagnosing the severity of the injury.  In any event, neither of these acts are the basis of DiDonato's Section 1983 claims.  As this Court noted before, DiDonato's claim is that Panatera failed to do anything more than wrap her head in a towel and that he denied her proper medical care by failing to call 911 or taking her to a hospital for emergency care.  (Dkt. 37 at 10; Dkt. 51 at 4; Dkt. 52 at 3).  This inaction, as DiDonato has alleged it, relates more to Panatera's role as a bystander than a paramedic, and actions unrelated to a state actor's official duties are not taken under color of law. *See, e.g., Wilson*, 624 F.3d at 394 (alderman was not acting under color of state law when he beat a man after a parking dispute because enforcing parking laws was not related to his purely legislative aldermanic duties); *Latuszkin v. City of Chicago*, 250 F.3d 502, 505-06 (7th Cir. 2001) (police officer was not acting under color of state law when he drove drunk in personal vehicle, did not "display[ ] any police power," and did not "possess[ ] any indicia of his office" at time of accident); *Cole v. City of Chicago*, No. 06 C 4704, 2008 WL 68687, at *3-4 (N.D. Ill. Jan. 4, 2008) (on-duty paramedics who stood by and watched while their colleague assaulted a patient "were not performing any paramedic duties" and thus were not acting under color of state law); *Vanderline v. Brochman*, 792 F. Supp. 52 (N.D. Ill. 1992) (two firefighters who beat and handcuffed plaintiffs, showed them a badge and told plaintiffs they were "the law" were not acting under the color of state law).  As DiDonato has failed to show that Panatera acted under color of state law, her Section 1983 claim fails on this ground.

**App. 012**

### III.    Remaining State-Law Claims

This leaves only state-law claims for negligence, assault, battery, and willful and wanton misconduct (Counts I-III; V).  Having dismissed the only federal claims in this action, the Court declines to exercise supplemental jurisdiction over the remaining state-law claims.    28 U.S.C. § 1367(c)(3); *see also Dietchweiler by Dietchweiler v. Lucas*, 827 F.3d 622, 631 (7th Cir. 2016).

### CONCLUSION

For the reasons stated here, the Court grants the City's (Dkt. 40) and Panatera's (Dkt. 43) motions to dismiss as to the Section 1983 claims only.  Count IV is dismissed with prejudice as to both Defendants.  Counts I through III and Count V are dismissed without prejudice as the Court declines to exercise supplemental jurisdiction over them.

Virginia M. Kendall
United States District Judge

Date: February 28, 2020

**App. 013**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

KYLIE DIDONATO,                          )
                                                    )
         Plaintiff,                    )
                                                      )
         v.                           )    Case No: 19-cv-2737
                                                      )
TIM PANATERA and CITY OF                 )
CHICAGO, a Municipal Corporation,        )
                                                    )
         Defendants.                   )

## SECOND[1] AMENDED COMPLAINT AT LAW

NOW COMES Plaintiff, KYLIE DIDONATO, by and through her attorneys, Nicholas Esposito and Christopher Crimer, and for her Second Amended Complaint against the Defendants, TIM PANATERA ("Panatera") and the CITY OF CHICAGO ("Chicago") (collectively referred to herein as "Defendants"), states as follows:

1.     Plaintiff, KYLIE DIDONATO ("DiDonato"), resides in the State of Illinois.

2.     Defendant, TIM PANATERA ("Panatera"), resides in the State of Illinois.

3.     Defendant, CITY OF CHICAGO ("Chicago"), is a Municipal Corporation, located in Cook County, Illinois, with its principal place of business in Cook County, Illinois.

4.     This action is brought pursuant to 42 U.S. Code § 1983, as amended, for committing acts, under color of state law, with the intent and for the purpose of depriving Plaintiff of rights secured under the Constitution and laws of the United States and 28 U.S. Code § 1367(a) Supplemental Jurisdiction for related state claims. The Court has jurisdiction in this matter

---

[1] This action was originally filed in the Circuit Court of Cook County, Illinois, Case Number 2018 L 013201, and was removed to the Northern District of Illinois by the defendant City of Chicago.

pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, and

§1343(4) because this action arises from an Act of Congress for the protection of civil rights.

5.      Venue in this district is proper under 42 U.S.C. § 2000e-5(f) (3) and 28 U.S.C. §

1391(b) and (c) because the alleged conduct occurred in this district, the individual Defendant

resides in this district, and Defendant is a municipal corporation within this judicial district.

6.      The City of Chicago has the authority to appoint and hire paramedics and/or EMTs.

7.      The City of Chicago Fire Department and related paramedic and/or EMT services

are funded by public funds.

8.      At all relevant times, Defendant Panatera was employed by the City of Chicago as

a Paramedic and/or Emergency Medical Technician (EMT), and at all times relevant hereto,

Panatera was acting under color of state law and as the employee, agent or representative of the

City of Chicago.  Panatera is being sued in his individual capacity.

9.      On or about March 18, 2018, DiDonato visited Panatera's home located at 6016 S.

Merrimac Avenue, Chicago, Illinois. Panatera drove her there.

10.     Late at night on March 18, 2018, Panatera and DiDonato had been in Panatera's

hot tub. DiDonato was wearing undergarments. DiDonato left the hot tub and dried her legs and

feet to use Panatera's bathroom. Upon entering the bathroom, DiDonato was caused to slip and

fall on the cold floor and hit the back of her head on the tub sustaining severe and permanent

injuries.

11.     Immediately upon and after DiDonato injured herself in Panatera's bathroom,

Panatera entered the bathroom and saw DiDonato sitting on the floor next to the bathtub, saw blood

flowing from DiDonato, and trained Paramedic/EMT Panatera stated, "Holy shit, that's bad."

12.     DiDonato was immobile, disoriented and confused. She could not move herself.

**App. 015**

13.    Panatera, a trained Paramedic/EMT, was taught the manner in which to begin to attend to DiDonato and her injuries in his bathroom.

14.    In performance of his official duties as a trained Paramedic/EMT, Panatera picked DiDonato off the floor, placed her in his bathtub, turned on the tub's shower over and about her head and body, and rather than find and treat her wound, rinsed blood from her head and body and keeping the blood off his bathroom floor.

15.    Panatera turned off the shower. DiDonato remained immobile, disoriented and confused.

16.    In performance of his official duties as a trained Paramedic/EMT, Panatera, facing DiDonato, placed his hands under her arms, lifted her from the tub, and placed her on the bathroom floor.

17.    Panatera did not clean or cover the bathroom floor before doing so.

18.    In performance of his official duties as a trained Paramedic/EMT, while DiDonato remained on the bathroom floor, Panatera provided her medical assistance in that he wrapped DiDonato's head with a non-sterile bathroom towel.

19.    To Panatera's knowledge, DiDonato could not stand.

20.    To escape from Panatera's custody, while remaining disoriented, DiDonato got on all fours and attempted to crawl out of the bathroom.

21.    Panatera picked up DiDonato, took her to his bed, and laid her upon it. He covered her with a bedsheet. She still had the towel wrapped around her head.

22.    It was late evening of March 18, or very early morning of March 19, 2018.

23.    DiDonato could not get out of his bed and stand up.

24.    DiDonato, in a state of immobility, disoriented and near unconsciousness, did not have the liberty to get out of Panatera's bed, leave his home or get to a telephone or her cell phone

**App. 016**

to call for help without Panatera's assistance, all of which Panatera knew when he placed her in his bed and kept her in his house.

25.    Rather, Panatera deprived her of the freedom to act. Instead, he kept her in his house for his own purposes. While remaining immobile and unable to care for herself, DiDonato felt and then observed Panatera assault her by attempting to mount her in a sexual manner to have non-consensual sexual intercourse with her.  He was on top of her breathing. She heard him say, "Fuck, I didn't cum."  She remembers physical pressure on her body.  She did not invite Panatera to be on top of her for any reason. DiDonato lost consciousness which Panatera knew or as a trained EMT should have known.

26.    The next morning on March 19, 2018, DiDonato was still in Panatera's bed. She had not gotten out of Panatera's bed. At the time, DiDonato is five-foot five inches tall and weighed 123 pounds. She was awakened by Panatera placing his bodily pressure on her body and him breathing. He had inserted himself in her and was having non-consensual sexual intercourse with her.  She does not remember if he finished having sex with her.

27.    DiDonato again lost consciousness and remained in Panatera's bed until he awakened her about late afternoon on March 19, 2018.

28.    On or about March 19, 2018 in the later afternoon, while at Panatera's home and in Plaintiff's presence, Panatera took a phone call from his work partner during which they purportedly engaged in a work-related conversation.

29.    On information and belief, at the time of the call, Panatera was "on call" through his job as a paramedic with the City of Chicago on March 19, 2018.

30.    DiDonato heard Panatera talking on a phone while walking into his bedroom in the afternoon of March 19, 2018.  He was laughing.  He told DiDonato it was his partner and that he had to work and that she had to leave.

**App. 017**

31.     DiDonato could not leave Panatera's home unassisted. Panatera told her she had an unsteady gait and knew she required help to leave his home.

32.     DiDonato does not recall putting her clothes on. Panatera put a used fleece hat on her head to cover up or mask the open head wound.

33.     DiDonato was still in pain, groggy, and covered with dried blood. Panatera helped her to his car. She could not have walked to her car without his assistance. Panatera accumulated DiDonato's personal belongings, put a used fleece hat on her head to cover the open head wound and blood in her hair, took her to his vehicle, and drove her from his Chicago home to DiDonato's west suburban place of residence.

34.     From and after her injury and through the time that he drove her to her home, the only medical services provided to DiDonato by Panatera, a City of Chicago Paramedic and EMT, was to wrap the non-sterile towel around her head.

35.     Panatera kept DiDonato in his home until he drove her to her home.  At all times, he had control of her in his house and in his car.  She did not have the freedom to act on her own behalf or provide herself medical care because she was in and out of consciousness, immobile, and disoriented.

36.     Upon return to her home, DiDonato contacted a friend for help who immediately drove to DiDonato's place of residence.

37.     DiDonato's friend observed her open head wound and her blood-dried and matted her.  DiDonato's friend helped her to his automobile and drove her to the Adventist Hinsdale Hospital Emergency Room ("ER").

38.     At the ER, DiDonato was diagnosed with head trauma, concussion, and other related symptoms. She was treated with sutures and staples to her head, medication, and instructions for continuing and follow-up care. Thereafter, DiDonato sought and received and

**App. 018**

continues to receive medical and mental care.

39.    Panatera's assaults caused actual harm, including physical, mental, emotional and consequential harm and damages.

**COUNT I**
**Negligence Against Panatera**

40.    Plaintiff hereby incorporates paragraph 1-39 by reference and makes them paragraph 40 herein.

41.    At the aforesaid time and place, DiDonato was lawfully on said premises as Panatera's invitee.

42.    At the aforesaid time and place, Panatera had a duty to maintain, clean, and/or keep clear the aforementioned premises, including the bathroom floor, in a reasonably safe condition for persons lawfully on said premises, to include DiDonato herein.

43.    At the aforesaid time and place, Panatera, disregarding said duty, caused and/or failed to properly maintain, clean, and/or keep clear the aforementioned premises, including the floors, causing the floor to become slippery and/or accumulate water so as to render the floor dangerously slippery and unsafe for use, and as a result of this dangerous condition, DiDonato slipped and fell.

44.    At the aforesaid time and place, Panatera, as the maintainer of the aforementioned premises, acted with less than reasonable care and was then and there guilty of one or more of the following careless and negligent act and/or omissions:

    a.    Improperly maintained and controlled his premises in failing to maintain the aforementioned floors on the premises;

    b.    Failed to provide slip guards and/or slip resident surfaces in the aforementioned premises for an unreasonable length of time;

**App. 019**

    c.    Failed to warn DiDonato of the dangerous condition when Panatera knew or should have known in the exercise of ordinary care that said warning was necessary to prevent injury to DiDonato;

    d.    Failed to make a reasonable inspection of his premises when he knew or in the exercise of ordinary care should have known that said inspection was necessary to prevent injury to DiDonato;

    e.    Allowed the aforementioned premises to remain in a dangerously slippery condition, making the floors unfit for passage, for an unreasonable length of time;

    f.    Was otherwise careless and negligent in the operation of the premises.

45.    While providing DiDonato medical treatment, he delayed and/or failed to provide other basic medical treatment: Panatera did not call 911; Panatera did not summon the police and/or an EMT emergency vehicle; Panatera did not contact his Paramedic/EMT unit and fellow employees about DiDonato's injury; and, Panatera did not personally transport DiDonato in his own vehicle to a medical facility and/or emergency room for immediate medical emergency treatment.

46.    As a direct and proximate result of one or more of the foregoing negligent acts or omissions of Panatera, DiDonato fell on the bathroom floor crushing the rear of her head against the edge of the bathroom tub, causing sustained severe and permanent injuries, including but not limited to, head and body trauma, an open head wound, considerable loss of blood, semi-unconsciousness, a concussion, memory loss, imbalance, falls, nausea, hand tremors, and other related injuries, some of which were open and obvious, and which injuries will hinder and prevent DiDonato from attending to her usual duties and affairs of life; DiDonato lost and will in the future lose value of that time as aforementioned.

**App. 020**

47.     As a direct and proximate result of the aforesaid careless and negligent acts, DiDonato then and there suffered great pain and mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical care, treatment, loss of earnings, loss of ability to earn money and will in the future continue to suffer.  DiDonato further expended and will expend and become liable for large sums of money for medical care and services endeavoring to become healed and cured of said injuries.

**WHEREFORE**, Plaintiff, KYLIE DIDONATO, prays for judgment against the Defendant, TIM PANATERA, in such an amount in excess of this Court's jurisdictional requisite as will fairly and adequately compensate the Plaintiff for her injuries, losses and damages as herein above-alleged, costs of suit, and any further relief which this Honorable Court finds fair and just.

## COUNT II
### Assault Against Panatera

48.     Plaintiff hereby incorporates paragraph 1-47 by reference and makes them paragraph 48 herein.

49.     Panatera intended to commit the act of sexual assault.

50.     DiDonato was caused to be harmed by Panatera, including physical, mental, and emotional harm and damages.

51.     DiDonato has and will continue to suffer physical and emotional damages.

**WHEREFORE**, Plaintiff, KYLIE DIDONATO, prays for judgment against the Defendant, TIM PANATERA, in such an amount in excess of this Court's jurisdictional requisite as will fairly and adequately compensate the Plaintiff for her injuries, losses and damages as herein above-alleged, costs of suit, and any further relief which this Honorable Court finds fair and just.

**App. 021**

**COUNT III**
**Battery Against Panatera**

52.     Plaintiff hereby incorporates paragraph 1-51 by reference and makes them paragraph 52 herein.

53.     Panatera intended to commit the act of sexual battery.

54.     DiDonato was caused to be harmed by Panatera, including physical, mental, and emotional harm and damages.

55.     DiDonato has and will continue to suffer damages.

**WHEREFORE**, Plaintiff, KYLIE DIDONATO, prays for judgment against the Defendant, TIM PANATERA, in such an amount in excess of this Court's jurisdictional requisite as will fairly and adequately compensate the Plaintiff for her injuries, losses and damages as herein above-alleged, costs of suit, and any further relief which this Honorable Court finds fair and just.

**COUNT IV**
**Federal Claims Pursuant to 42 U.S.C. § 1983 for Deliberate Indifference (Denial of Proper Medical Care) Against TIMOTHY PANATERA**

56.     Plaintiff hereby incorporates paragraph 1-55 by reference and makes them paragraph 56 herein.

57.     This Count arises under the United State Constitution and the Civil Rights Act of 1871 (42 U.S.C. § 1983).

58.     42 U.S. Code §1983 states, "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for any

9

**App. 022**

act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia."

59.    Under the Supremacy Clause, state courts including this Court have a concurrent duty to enforce federal law according to their regular modes of procedure. See, e. g., *Claflin v. Houseman*, 93 U.S. 130, 136 -137.

60.    Rather than transport, or cause to be transported, DiDonato to a medical facility for emergency medical care, Panatera deliberately kept DiDonato under his custody while she was not in sound and lucid mind and thus, without her knowing consent, and did not remove her from his premises for over twelve (12) hours after she sustained her head trauma.

61.    While in Panatera's custody and care, as a trained Paramedic/EMT, he deliberately and intentionally failed to provide DiDonato with necessary medical attention so as not to disclose the location and cause of her injuries and/or in wilful and wanton disregard of his duties as a Paramedic/EMT.

62.    To Panatera's knowledge as a trained Paramedic/EMT, DiDonato's injures mandated medical treatment beyond application of a non-sterile towel around her head and wounds and were so obvious that a lay person would and did easily recognize that she was injured physically and mentally, and that she required immediate medical attention.

63.    As a result of the Defendants' unconstitutional conduct DiDonato suffered and continues to suffer pain, injury, and emotional distress.

64.    DiDonato was caused to be harmed by Defendants, including physical, mental, and emotional harm and damages.

65.    DiDonato has and will continue to suffer damages.

**App. 023**

**WHEREFORE**, Plaintiff, KYLIE DIDONATO, prays for judgment against the Defendants, TIM PANATERA, in such an amount in excess of this Court's jurisdictional requisite as will fairly and adequately compensate the Plaintiff for her injuries, losses and damages as herein above-alleged, costs of suit, and any further relief which this Honorable Court finds fair and just.

**COUNT V**
**Willful and Wanton Misconduct**
**Against TIMOTHY PANATERA and the CITY OF CHICAGO**

66.     Plaintiff hereby incorporates paragraph 1-65 by reference and makes them paragraph 66 herein.

67.     During the normal course of his Panatera's duties as a trained City of Chicago Paramedic/EMT providing emergency medical assistance, Defendants are liable to DiDonato as a result of their acts or omissions in providing such services arising from Panatera's acts or omissions and conscious disregard for DiDonato's safety in initiating but failing to provide any medical assistance beyond putting a towel around DiDonato's head and washing off her blood and his failure/omission to not contact 911, his EMT or any other EMT unit, and/or transport DiDonato to any nearby or other nearby hospitals or medical facilities in accordance with the protocols developed pursuant to this Act, and/or hiding her injuries from medical personnel, and/or withholding required emergency medical treatment, and/or acting with conscious indifference and utter disregard for DiDonato, constituting willful and wanton misconduct, and for which no immunity exists pursuant to 745 ILCS 49/70 and/or or 210 ILCS 50/3.150.

68.     DiDonato was caused to be harmed by Defendants, including physical, mental, and emotional harm and damages.

69.     DiDonato has and will continue to suffer damages in excess of $35,000.

**App. 024**

**WHEREFORE**, Plaintiff, KYLIE DIDONATO, prays for judgment against the Defendant, TIM PANATERA and CITY OF CHICAGO, in such an amount in excess of this Court's jurisdictional requisite as will fairly and adequately compensate the Plaintiff for her injuries, losses and damages as herein above-alleged, costs of suit, and any further relief which this Honorable Court finds fair and just.

Respectfully submitted,

**KYLIE DIDONATO**,
Plaintiff,

By:    /s/ Nicholas F. Esposito
One of her attorneys

Nicholas F. Esposito, Atty. # 0755176
Christopher K. Crimer, Atty. # 6319104
ESPOSITO & STAUBUS LLP
7055 Veterans Blvd., Unit B
Burr Ridge, IL 60527
(312) 346-2766

## PROOF OF SERVICE

I, Nicholas F. Esposito, an attorney, hereby certify that I have filed the aforementioned document via Electronic Case Filing (ECF) with the United States Northern District of Illinois which will send notification to the below-referenced individuals this 13th day of September, 2019.

| | |
|---|---|
| Michael D. Gallo | Kyle A. Rockershousen |
| Elizabeth A. Walsh | Iris Chavira |
| Bruce Farrel Dorn & Associates | Andrea Campbell |
| 120 N. LaSalle Street, Suite 1900 | City of Chicago – Department of Law |
| Chicago, Illinois 60602 | 30 N. LaSalle Street, Suite 900 |
| Home.law-dorn@statefarm.com | Chicago, Illinois 60602 |
| | Kyle.Rockershousen@CityofChicago.org |
| | Iris.Chavira@CityofChicago.org |
| | Andrea.Campbell@CityofChicago.org |

/s/ Nicholas F. Esposito

12

**App. 025**